UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Demetrius Montgomery,

                    Petitioner,                   Case Number: 22-11759
                                               Hon. George Caram Steeh

     v.

Terry Wilkins,[1]

                    Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Demetrius Montgomery, proceeding *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his first-degree premeditated murder conviction for which he is serving a sentence of life without parole. He raises four claims for relief.  The Court finds that Petitioner's claims do not warrant relief and denies the petition. The Court denies a certificate of appealability and grants Petitioner leave to appeal *in forma pauperis*.

---

[1]The proper respondent in a habeas case is the custodian of the facility where the petitioner is incarcerated.  *See* Rule 2(a), Rules Governing Section 2254 Cases.  Terry Wilkins is the warden at the facility where Petitioner is incarcerated.  The Court orders Terry Wilkins be substituted as the Respondent.

## I.   Background

Following a jury trial in Washtenaw County Circuit Court, Petitioner was convicted of first-degree premeditated murder.  Petitioner filed an appeal by right in the Michigan Court of Appeals.  The Michigan Court of Appeals set forth the following relevant facts:

> Defendant murdered his girlfriend, LMB, on June 18, 2017. Defendant and the victim dated for 9 or 10 years and their relationship involved a history of defendant assaulting LMB. Motive evidence was presented that defendant wanted to end the relationship with the victim because he was dating another woman, RC, who was pregnant with his baby.
>
> At the time of her murder, LMB lived with defendant in an apartment in Ypsilanti, however as stated defendant was also in the relationship with RC.  Approximately two weeks before LMB's murder, LMB's sister overheard defendant threaten LMB: "bitch I will kill you."  On the day before LMB's death, defendant also sent LMB numerous text messages expressing his desire to be with his other girlfriend and to have the baby with her.  At the same time, defendant also texted his desire to see LMB dead, stating: "I swear I can't wait until you die," "You will die this summer," and "RIP Bitch."
>
> The evidence at trial indicated that LMB was stabbed repeatedly—and died—in the apartment in Ypsilanti. Significant bloodstaining; including spatter and drops, as well as a saturation stain on the bed; was found throughout the apartment.  Three knives, two of which were broken, were found in the apartment.  All the knives tested positive for the presence of blood.  The evidence indicated that, after stabbing LMB, defendant washed LMB's body in the shower; he attempted to clean-up blood in the apartment; and defendant then drove LMB's body in a Ford Flex to his cousin's home in Detroit.  LMB's body was found on the floor in the backseat of the car.

Before fleeing in his cousin's Yukon, defendant told those present at his cousin's house that he "was sorry" and that he "didn't mean to."  During phone calls to his cousin later that night, which were overheard by a family friend, Chavon Patton, defendant confessed to stabbing LMB, admitting that he stabbed her in the stomach because he thought she was sleeping with someone else.  Defendant fled the state, and he was later arrested in Alabama.  A body-camera video recording of defendant's arrest was played for the jury.

In contrast, the defense theory of the case—based primarily on statements that defendant gave to police—was that three unidentified robbers entered the apartment while LMB and defendant were present and that the robbers stabbed LMB. According to the defense, the robbers were looking for money that LMB stole or they were going to rob defendant because he was a known drug dealer.  Significantly, the defense also maintained that, after being stabbed, LMB showered, laughed and talked, and walked unassisted to the Ford Flex of her own volition.  Defendant then drove her to his cousin's home because he was afraid to call 911 or take her to a hospital. Defendant seemingly, albeit confusingly, partially relies on evidence that he claimed his hand had been injured.

However, there were numerous inconsistencies in defendant's statement to police, and the forensic evidence and expert testimony refuted defendant's claims that LMB walked to the Ford Flex and that she was alive in the car. For example, a bloody imprint of a body on the floor of the apartment[] showed where LMB's body had been dragged in or out of the bathroom, belying defendant's claim that LMB showered under her own power. Additionally, there was no blood in the stairwell in the apartment or outside the apartment building to indicate that LMB walked—while alive and bleeding—from the apartment to the car.  Instead, according to the pathologist who performed LMB's autopsy as well as other testimony regarding the relative lack of blood on LMB's body and in the car, LMB was dead, and her body had been washed, before she was placed in the vehicle.

Forensic evidence also linked defendant to the murder scene at the apartment and LMB's body.  For example, defendant's fingerprints were found on a plastic bag containing a bloody sheet, and bloody footprints on packets of Hawaiian Punch and a plastic bag found on the floor in the apartment were consistent with the right-foot version of a shoe of which defendant had a left-foot version.  Scratches on LMB's back contained a mixture of DNA from three individuals (one of whom was LMB), and DNA analysis provided "very strong support" that defendant was one of the contributors.  DNA evidence also indicated that LMB's blood was found on defendant's T-shirt, recovered in the Yukon vehicle in which defendant fled from his cousin's home.

Defendant attaches to his Standard 4 brief a number of documents appearing to be records reflecting that he made numerous complaints while in jail that his hand was injured.  All of those documents, however, reflect that his hands were examined by a doctor and found to be in fine working condition.  Furthermore, we have reviewed the body-camera footage of defendant's arrest, and although his hands are only visible briefly, they do not appear to be injured and he appears to use them normally.  Indeed, at one point he knocked the arresting officer down after a chase.  The arresting officer testified that he weighed 260 pounds and defendant used both hands to push both himself and the officer up off the ground. Defendant did not mention his hand during his first police interview, but rather only in his second interview.

*People v. Montgomery*, No. 349690, 2020 WL 6816573, at *1-2 (Mich. Ct. App. Nov. 19, 2020).

The Michigan Court of Appeals affirmed Petitioner's conviction and sentence.  *Id.* Martin filed an application for leave to appeal in the Michigan

Supreme Court.  The Michigan Supreme Court denied leave to appeal.

*People v. Montgomery*, 507 Mich. 933 (Mich. April 27, 2021).

Martin then filed this habeas corpus petition.  He raises these claims:

I.  Petitioner was denied a fair trial when improper MRE 404(B) evidence of sexual activity with an underage witness and allegations of criminal sexual conduct were testified to in this murder case unrelated to sexual conduct.

II.  Petitioner's conviction for first-degree murder must be reversed, as the prosecution presented constitutionally insufficient evidence on the requisite element of premeditation and deliberation and as such defense counsel was ineffective for not seeking a direct verdict.

III.  Petitioner's trial counsel Ms. Cox was ineffective for not investigating the GPS reports from the black Yukon before trial, and also not investigating the T-Mobile phone the prosecutor John Vella said Mr. Montgomery was using while in the black Yukon.

IV.  Mr. Montgomery was denied his due process rights, when the prosecuto[r] John Vella, and trial Judge David Swartz "suppressed evidence," by not allowing Mr. Montgomery's counsel the opportunity to play a recorded statement made by the prosecution witness Chavon Patton, when she took the stand at trial.

Respondent argues that a portion of Petitioner's first and fourth claims are procedurally defaulted.  The Court is not required to address a procedural default issue before deciding against the petitioner on the merits.  *Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we

may decide the merits first.").  Here, rather than conduct a lengthy inquiry

into procedural default, judicial economy favors proceeding directly to a

discussion of the merits of Petitioner's claims.

## II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim —
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal

law if the state court arrives at a conclusion opposite to that reached by the

Supreme Court on a question of law, or if the state court decides a case

differently than the Supreme Court has on a set of materially

indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000).

An "unreasonable application" occurs when "a state-court decision

unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.

AEDPA "imposes a highly deferential standard for evaluating state-court rulings," and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* A "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). This presumption is rebutted only with clear and convincing evidence. *Id.* Moreover, for claims

adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.   Discussion

### A.   Claim One: Admission of Other-Acts Evidence

Petitioner's first claim concerns the admission of his ex-girlfriend JB's testimony that she had a sexual relationship with Petitioner when she was 15 years old and that he forced her to have sex in front of children and family members.  Respondent maintains that a portion of this claim is procedurally defaulted and that the claim is meritless.

The Michigan Court of Appeals held that this evidence was admissible under Mich. Comp. Laws § 768.27b and the Michigan Rules of Evidence:

> [T]he prosecutor introduced the other-acts evidence under MCL 768.27b(1), which in relevant part states: "in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under [MRE 403]." Unlike MRE 404(b), which precludes the admission of evidence solely for propensity purposes, MCL 768.27b allows for the introduction of evidence of domestic violence to establish a defendant's propensity or character to commit acts of domestic violence. *People v. Railer*, 288 Mich. App. 213, 219-220; 792 N.W.2d 776 (2010). In other words, "[other]-acts evidence of domestic violence can be admitted at trial because a full and

complete picture of a defendant's history ... tend[s] to shed light on the likelihood that a given crime was committed." People v. Cameron, 291 Mich. App. 599, 610; 806 N.W.2d 371 (2011) (quotation marks and citation omitted; alterations in Cameron).

Defendant was charged with the murder of his girlfriend with whom he lived. Thus, he was charged with an act causing physical harm to a person with whom he lived and had a dating relationship; this constitutes an offense involving domestic violence. See MCL 768.27b(6)(a)(i), (b)(ii), (b)(iv). In this context, the prosecutor introduced other-acts evidence relating to domestic violence perpetrated on the victim, including incidents during which (1) defendant beat LMB and hit her head against a bathtub in a motel; (2) defendant burned off LMB's eyelashes with a lighter; (3) defendant punched LMB in the face, threw her phone out of the car window, and burned her with a cigarette; (4) defendant slapped LMB and pulled out her hair weave; and (5) defendant beat and stabbed LMB, prompting her to jump out a window to escape. The prosecutor also offered evidence of domestic violence involving JB, one of defendant's former girlfriends and the mother of his child. JB testified about incidents during which (1) defendant beat her and threw her in the street; (2) defendant chased her vehicle with his vehicle and drove her off the road; and (3) defendant put her in a trunk, beat her with a vase, and knocked out her teeth.

In addition, relevant to defendant's arguments on appeal, JB testified that there were times during their relationship when defendant forced her to perform sexual acts, including an incident when he made her have sex with him in front of her children and another time when family members were present while he sexually assaulted her. These acts involving forced sexual activity are the only other-acts evidence that defendant challenges on appeal. Defendant contends that the acts of sexual assault against JB were irrelevant and inadmissible propensity evidence, and that they were unfairly prejudicial because JB was a minor when he forced her to engage in sexual activity.

Again, the acts were introduced pursuant to MCL 768.27b, under which prior acts of domestic violence demonstrating a propensity to commit acts of domestic violence are relevant. ... Further, under MCL 768.27b(6)(a)(iii), an act of "domestic violence" includes causing an individual with whom a defendant has a dating relationship to "engage in involuntary sexual activity by force, threat of force, or duress."  Defendant's act of forcing his girlfriend to engage in sexual activity constitutes domestic violence, and particularly when considered with the other instances of past domestic violence, this act provides a full and complete picture of defendant's history and establishes defendant's propensity to commit domestic violence against women with whom he has a dating relationship. ... This evidence was, therefore, relevant and admissible under MCL 768.27b, subject to MRE 403.

Under MRE 403, the probative value of this evidence was not outweighed by the danger of unfair prejudice.  In this context, the propensity value of the evidence weighs in favor of its admission. ... Although prejudicial, the evidence relating to the forced sexual activity was extremely brief and not nearly as graphic as the evidence relating to LMB's death or defendant's other numerous acts of domestic violence against LMB and JB. *See Railer*, 288 Mich. App. at 220.  We are not persuaded that, in light of the other allegations against defendant and acts described, cursory references to JB's age were likely to incite such "passion as to divert the jury from rational consideration" of defendant's guilt or innocence of the charges.  *See Cameron*, 291 Mich. App. at 611-612.  Indeed, the prosecutor made no attempt to emphasize JB's age at trial, and the trial court minimized the prejudicial effect of the other-acts evidence by instructing the jurors that they could not convict defendant because they believed him to be guilty of other bad conduct. ... "All relevant evidence is prejudicial; it is only unfairly prejudicial evidence that should be excluded." *People v. McGhee*, 268 Mich. App. 600, 613-614; 709 N.W.2d 595 (2005). We are unable to find that the probative value of evidence establishing defendant's propensity to commit domestic violence was outweighed by the danger of unfair prejudice. MRE 403. Consequently, defendant has not shown that the trial court

erred by admitting evidence that defendant committed other-acts of domestic violence against JB, including forcing her to engage in sexual activity.

Even if it had been error to admit the evidence that defendant forced JB to have sex while JB was a minor, any such error was not outcome-determinative. .... There was considerable evidence that defendant stabbed the victim repeatedly with a knife in their apartment and that he then washed her body and transported her to his cousin's home, where he left her body in a Ford Flex before fleeing the state. Defendant's contrasting version of events—that LMB was stabbed by intruders and that she was "okay" and alive in the Ford Flex—lacks any evidentiary support. Defendant's version was disproved by the evidence at trial, including the bloody body imprint on the floor of the bathroom, expert testimony indicating that LMB was dead when placed in the vehicle, defendant's admissions during phone calls to his cousin, defendant's efforts to clean blood in the apartment, and defendant's flight evincing a consciousness of guilt.[]

Moreover, on appeal, defendant only challenges the other-acts evidence involving forced sex between defendant and JB; he does not challenge the admission of the other numerous acts of domestic violence he perpetrated against LMB and JB, which clearly demonstrated his propensity to commit domestic violence and further bolstered the conclusion that LMB's death was the result of yet another instance of domestic violence perpetrated by defendant on LMB. *Cf. People v. Rosa*, 322 Mich. App. 726, 738; 913 N.W.2d 392 (2018) (concluding that error in admitting other-acts evidence was harmless because exclusion of this evidence "would not have spared defendant from the devastating propensity evidence that was properly admitted" under MCL 768.27b). Given the considerable evidence of defendant's guilt, any error in the admission of evidence about forced sex between defendant and JB did not affect the outcome of proceedings, so defendant is not entitled to relief on appeal.

*Montgomery*, 2020 WL 6816573 at *4-5.

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, Supreme Court precedent. First, to the extent that Petitioner alleges a violation of state law, his claim is not cognizable on federal habeas review. *Shoemaker v. Jones*, 600 F. App'x 979, 984 (6th Cir. 2015). A federal court may grant an application for writ of habeas corpus only on the ground that the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States, and not for perceived errors of state law. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Second, Petitioner fails to show a due process violation. The admission of evidence may violate the Due Process Clause (and thereby provide a basis for habeas relief) where the admission "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (2003). The Supreme Court "defined the category of infractions that violate fundamental fairness very narrowly." *Estelle*, 502 U.S. at 73 (1991). To violate due process, an evidentiary decision must "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.

- 12 -

2000) (citation omitted). This standard accords the state courts "wide latitude ... with regard to evidentiary matters under the Due Process Clause." Id.

For the reasons discussed by the Michigan Court of Appeals, the challenged evidence was relevant and probative.  "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). The Supreme Court has not addressed the issue of propensity evidence in constitutional terms, finding admission of such testimony more appropriately addressed in codes of evidence and procedure than under the Due Process Clause.  *Dowling v. United States*, 493 U.S. 342, 352 (1990).  Indeed, "[t]he Supreme Court has never held (except perhaps within the capital sentencing context) that a state trial court's admission of relevant evidence, no matter how prejudicial, amounted to a violation of due process."  *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012). Consequently, Petitioner fails to identify any "clearly established federal law" to which the state court's decision could be "contrary" within the meaning of section 2254(d)(1). *Bugh*, 329 F.3d at 513.

The Court concludes that it was not fundamentally unfair to admit evidence of Petitioner's prior conduct toward JB. Therefore, his right to due process was not violated by admitting the evidence, and he has no right to habeas relief on his claim.

## B.  Claim Two: Sufficiency of the Evidence

In his second claim, Petitioner argues that the prosecution presented insufficient evidence to support the premeditation and deliberation element of first-degree murder.

The Michigan Court of Appeals denied this claim on direct review:

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v. Bennett*, 290 Mich. App. 465, 472; 802 N.W.2d 627 (2010). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Plummer*, 229 Mich. App. 293, 300; 581 N.W.2d 753 (1998) (citation omitted).  "Some time span between the initial homicidal intent and the ultimate killing is necessary to establish premeditation and deliberation." *People v. Unger*, 278 Mich. App. 210, 229; 749 N.W.2d 272 (2008).  There is no minimum time required, but "the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a second look." *Plummer*, 229 Mich. App. at 300 (quotation marks and citation omitted).  Premeditation and deliberation may be inferred from all the facts and circumstances and established with circumstantial evidence and reasonable inferences drawn therefrom. ... Facts relevant to establishing premeditation includes evidence of "(1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the

defendant's conduct after the homicide." *Unger*, 278 Mich. App. at 229.

\*\*\*

Viewing the evidence in a light most favorable to the prosecutor, there was sufficient evidence of premeditation and deliberation to support defendant's convictions for first-degree murder.

The relationship between defendant and the victim, and the events leading up to the killing, provide evidence of a "preconceived motive." *See People v. Taylor*, 275 Mich. App. 177, 180; 737 N.W.2d 790 (2007). Defendant and LMB had a tumultuous relationship, marked by numerous acts of violence by defendant. About the time of LMB's death, defendant was also in a relationship with RC, with whom defendant was expecting a baby. As discussed, defendant made threats of death toward LMB. These prior threats and expressions of ill-will toward LMB are indicia of premeditation. *See People v. Lewis*, 95 Mich. App. 513, 515; 291 N.W.2d 100 (1980). Indeed, from defendant's relationship with RC and his text messages to LMB on the day before her death, the jury could reasonably infer that defendant had a preconceived motive for the killing.

The circumstances of the killing show that defendant had time to "take a second look." Most notably, police found three knives with blood on them at the crime scene. Two of the knives were broken, and the knives—or pieces of the knives—were found in different locations in the apartment: the kitchen, the bedroom, and the living room. Further, there was blood throughout the apartment—in the kitchen, living room, bedroom, and bathroom. LMB was stabbed multiple times, in her head and stomach; she also had defensive wounds to her hands and wrists. Moreover, the medical examiner testified that LMB's numerous injuries—with the possible exception of abrasions to her chin and foot—were inflicted while she was still alive. Among LMB's wounds were incise wounds to her head, and the medical examiner explained that it is difficult to stab through the skull and that a knife could break when trying to penetrate the skull.

- 15 -

The evidence at the crime scene, including the blood and multiple broken knives, and LMB's wounds indicate an extended and violent struggle between LMB and defendant that took place in multiple locations throughout the apartment.  The necessary duration of the struggle would have afforded defendant an opportunity to take a second look between his initial homicidal intent and the ultimate killing. .... The use of three knives, and the fact that defendant broke two of the knives, is particularly compelling evidence of premeditation and deliberation.  The trier of fact could reasonably infer that defendant had the time to retrieve two replacement knives after breaking two of them, during which he had time to reconsider what he was doing. *Cf. People v. Haywood*, 209 Mich. App. 217, 230; 530 N.W.2d 497 (1995) ("[T]he evidence establishes that two separate weapons, a brush and a broom handle, were used to beat the victim, giving defendant the time to take a second look and reconsider his decision.").  Considered in conjunction with the other evidence, the fact that defendant inflicted multiple wounds further supports the conclusion that defendant had time to take a second look.  *See Unger*, 278 Mich. App. at 231. Overall, this series of separate and distinct acts of violence—with time in between for defendant to reflect while twice retrieving a new weapon—allowed defendant time to take a second look and supported the conclusion that defendant acted with premeditation and deliberation. ...

The evidence further shows that after the killing, defendant (1) tried to conceal evidence by washing LMB's body, cleaning the bathroom and transporting LMB's body to another jurisdiction; (2) concocted an unsupported story about intruders to the apartment; and (3) fled the state, leaving his new girlfriend and baby.  These acts provide evidence of a consciousness of guilt that would allow the jury to conclude that defendant had a guilty state of mind and that he acted with premeditation. ... The jury was instructed on voluntary manslaughter, so the jury had the option of accepting that defendant killed LMB on impulse and in the heat of passion after learning that she slept with someone else.  The jury had ample evidence from which to find that defendant premeditated and deliberated the killing.

*Montgomery*, 2020 WL 6816573, at *6-7.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  On direct review, review of a sufficiency of the evidence challenge focuses on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Sufficiency-of-the-evidence claims, in light of both *Jackson* and AEDPA, face a high bar in habeas proceedings because they are subject to two layers of deference:

> First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.  And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was objectively unreasonable.
>
> *Coleman v. Johnson*, 566 U.S. 650, 651, 132 S. Ct. 2060, 182 L.Ed.2d 978 (2012) (per curiam) (citations and internal quotation marks omitted).

*Tackett v. Trierweiler*, 956 F.3d 358, 367 (6th Cir. 2020)

Petitioner has not shown that the Michigan Court of Appeals' decision denying relief on this claim was contrary to, or unreasonably applied, clearly established federal law.  It is for the factfinder to weigh the evidence, assess the witnesses' testimony, and resolve any conflicts in the testimony or issues of witness credibility. *Jackson*, 443 U.S. at 319.  The factfinder, not a federal court on habeas review, has the responsibility "to draw reasonable inferences from basic facts to ultimate facts." *Id.* Petitioner argues that "at most, this was a spur-of-the-moment action" inspired by "instantaneous" anger when he learned that the victim had been intimate with someone else.  (ECF No. 1, PageID.31.)  For all the reasons listed by the Michigan Court of Appeals, there was ample evidence that Petitioner had time to take a second look.  Habeas relief is denied on this claim.

### C.  Claim Three: Ineffective Assistance of Counsel

In his third claim, Petitioner asserts that he was denied the effective assistance of trial counsel.  Specifically, he maintains counsel failed to: (1) investigate GPS reports relating to the Yukon; (2) investigate cell phone records involving a T-mobile phone; (3) move for a directed verdict; (4) re-

file motions filed by Petitioner's first attorney; (5) impeach witnesses with prior inconsistent statements; and (6) investigate favorable witnesses.[2]

On habeas corpus review, to prevail on an ineffective assistance of counsel claim, Petitioner must show that the state court's denial of his claim was contrary to, or an unreasonable application of, *Strickland v Washington*, 466 U.S. 668 (1984). *Strickland* established a two-prong test for claims of ineffective assistance of counsel: a habeas petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *See id.* at 687.

The standard for obtaining habeas corpus relief is "'difficult to meet.'" *White v. Woodall*, 572 U.S. 415, 419 (2014) (*quoting Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). In the context of an ineffective assistance of counsel claim under *Strickland*, the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks

---

[2]Petitioner's third through sixth ineffective assistance of counsel claims are not properly before the court because they are raised for the first time in his reply brief. A petitioner may not present a claim for the first time in a reply brief rather than in the petition. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) (concluding that a district court properly declined to address a claim that the petitioner first presented in a reply brief). Nevertheless, the Court will briefly address them on the merits.

omitted).  "[T]he question is not whether counsel's actions were reasonable"; but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.*

### 1.

The Michigan Court of Appeals denied Petitioner's claim that defense counsel was ineffective in failing to investigate GPS reports and to investigate cell phone records:

> [D]efendant has not explained the GPS or cell phone evidence he claims defense counsel should have investigated and presented at trial.  Absent support that such evidence exists and would be favorable to the defense, defendant has not established the factual predicate of his claim and there is no basis for concluding that defense counsel performed unreasonably by failing to pursue this evidence or that its admission would have altered the outcome of proceedings.

*Montgomery*, 2020 WL 6816573, at *9.

The state court's decision was not contrary to, or an unreasonable application of, *Strickland*.  Other than simply stating his claim that counsel should have handled the GPS and phone records differently, Petitioner fails to allege any facts to show that counsel's decision was anything other than a reasonable trial strategy.  He also fails to allege any specific ways in which counsel's alleged error prejudiced the defense.  Such conclusory allegations of ineffective assistance of counsel do not state a constitutional claim.  *Wogenstahl v. Mitchell*, 668 F.3d 307, 343 (6th Cir. 2012).

**2.**

Petitioner argues that counsel was ineffective for failing to move for a directed verdict.  Defense counsel's failure to move for a directed verdict based on the insufficiency of evidence was not ineffective assistance of counsel because, as discussed, sufficient evidence supported Petitioner's conviction.  *See Maupin v. Smith*, 785 F.2d 135, 140 (6th Cir. 1986) (holding that where there was sufficient evidence to support petitioner's conviction, petitioner could not establish he was prejudiced by counsel's failure to move for a directed verdict).

**3.**

Next, Petitioner argues that counsel failed to refile motions filed by Petitioner's first attorney. (ECF No. 15, PageID.1876.)  The record shows that defense counsel filed three of the four motions identified by Petitioner: a motion for payment for an expert witness, a motion for appointment of an investigator, and a motion to exclude 404(b) evidence.  (*See* ECF No. 10-10.)  Petitioner identifies the fourth motion as a motion to exclude evidence. Petitioner fails to specify what additional evidence counsel should have moved to exclude, explain whether the evidence was actually admitted, or show that the evidence was prejudicial to the defense.  Therefore,

Petitioner has not shown that defense counsel was ineffective in this
regard.

**4.**

Petitioner maintains that counsel failed to investigate and effectively
cross-examine prosecution witnesses.  The Michigan Court of Appeals
denied this claim:

> [D]espite defense counsel's thorough cross-examination of
> witnesses at trial, defendant contends that defense counsel
> failed to effectively cross-examine and impeach witnesses with
> "all" inconsistences.  However, how to question witnesses is
> presumed to be a matter of trial strategy, and we see nothing
> unreasonable in counsel's cross-examination strategy. See *id.*
> Indeed, defendant has not identified any specific questions
> counsel should have asked or explained how additional
> questioning would have affected the outcome. …. On this
> record, defendant has not shown that counsel's performance
> fell below an objective level of reasonableness or that counsel's
> alleged errors affected the outcome of the proceedings. *See*
> *Jackson*, 292 Mich. App. at 600-601.

*Montgomery*, 2020 WL 6816573, at *9.

A review of the record supports the state court's conclusion that
defense counsel vigorously cross-examined prosecution witnesses and
explored inconsistencies in their testimony.  The Michigan Court of
Appeals' conclusion that trial counsel's performance was not ineffective is
not contrary to or an unreasonable application of Supreme Court
precedent.

**5.**

Finally, Petitioner argues that counsel was ineffective for failing to investigate favorable witnesses.  Defense counsel has a duty to conduct a reasonable investigation into the facts of a defendant's case, or to make a reasonable determination that such investigation is unnecessary. *Strickland*, 466 U.S. at 690-91.  But a conclusory or speculative argument that counsel should have done more with no supporting evidence or offer of proof is insufficient to warrant habeas relief.  *Wogenstahl*, 668 F.3d at 335-36 ("[C]onclusory and perfunctory ... claims of [ineffective assistance of counsel] are insufficient to overcome the presumption of reasonable professional assistance and are insufficient to warrant habeas relief.").  Although Petitioner identifies a couple of witnesses he contends should have been called, he has failed to offer affidavits sworn by the proposed witnesses.  Petitioner has offered no evidence beyond his own assertions to show that the witnesses would have been willing to testify or what the content of these witnesses' testimony would have been.  In the absence of such proof, Petitioner is unable to establish that his attorney was deficient or that he was prejudiced by counsel's failure to call these witnesses.  This claim will be denied.

### D. Claim Four: Prosecutorial Misconduct

In his fourth claim, Petitioner asserts that the prosecutor engaged in misconduct.  Specifically, he claims: (1) the prosecutor and trial judge suppressed evidence in violation of the Due Process Clause by not allowing prosecution witness Chavon Patton's recorded statement to be played for the jury, and (2) the prosecutor allowed perjured testimony from Joann Fagan and Chavon Patton to go uncorrected.

A prosecutor's misconduct violates a criminal defendant's constitutional rights if it "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Prosecutorial misconduct entails much more than conduct that is "undesirable or even universally condemned."  *Id.* at 181 (internal quotation omitted).  To constitute a due process violation, the conduct must have been "so egregious so as to render the entire trial fundamentally unfair."  *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (citations omitted).

The *Darden* standard "is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations.'"  *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough v. Alvarado*, 541

U.S. 652, 664 (2004) (alteration in original).  "That leeway increases in assessing a state court's ruling under AEDPA," because the court "'cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites ... other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable.'"  *Stewart v. Trierweiler*, 867 F.3d 633, 638-39 (6th Cir. 2017) (quoting *Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015)).

First, Petitioner maintains that the prosecutor and the trial court judge violated *Brady v. Maryland*, 373 U.S. 83 (1963), when they suppressed favorable evidence.  The evidence to which he refers is a recorded statement given by Chavon Patton to police.  The trial court sustained the prosecutor's hearsay objection and held the statement inadmissible.  The Michigan Court of Appeals denied this claim: "Contrary to defendant's framing of the issue, the exclusion of the evidence on hearsay grounds does not involve a *Brady* violation because it is clear from the record that the defense had the interview in question in its possession.  *Montgomery*, 2020 WL 6816573, at *10.  The state court's decision was reasonable.  The evidence was not withheld from the defense and the trial court's evidentiary decision does not amount to a *Brady* violation.

Petitioner argues that the prosecutor also committed misconduct by allowing false testimony to go uncorrected.  He maintains that Chavon Patton's and Joann Fagans' testimony was perjured.  To support this assertion, Petitioner cites inconsistencies in their police statements and preliminary exam and trial testimony.  The Michigan Court of Appeals denied this claim because what Petitioner "characterizes as perjury in this case involves nothing more than inconsistencies and conflicts in the evidence that were a proper subject for cross-examination and consideration by the jury, not conclusive evidence that the testimony was false."  *Montgomery*, 2020 WL 6816573

The "deliberate deception of court and jury by the presentation of testimony known to be perjured" violates a defendant's due process rights, *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam), but "mere inconsistencies" in testimony are not enough.  *United States v. Lochmondy,* 890 F.2d 817, 822 (6th Cir. 1989).  A defendant must prove that the testimony was "indisputably false."  *See id.* at 822-23.  Petitioner fails to show that the state court's decision denying this claim was contrary to, or an unreasonable application of, Supreme Court precedent.

## IV.    Certificate of Appealability

To appeal the Court's decision, Petitioner must obtain a certificate of appealability.  To obtain a certificate of appealability, a petitioner must make a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).  A petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A federal district court must grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *See Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

The Court concludes that reasonable jurists would not debate whether the claims should have been resolved in a different manner. Thus, the Court will deny a certificate of appealability.

## V.  Conclusion

For the reasons discussed, the Court DENIES the petition for writ of habeas corpus and DENIES a certificate of appealability.

Although jurists of reason would not debate this Court's resolution of Petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and Petitioner may proceed *in forma pauperis* on

- 27 -

appeal.  *See Foster v. Ludwick*, 208 F. Supp. 2d 750, 765 (E.D. Mich. 2002).

     SO ORDERED.

                      s/George Caram Steeh
                      HON. GEORGE CARAM STEEH
                      UNITED STATES DISTRICT JUDGE

DATED:  November 18, 2024

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record
on November 18, 2024, by electronic and/or ordinary mail
and also on Demetrius Montgomery #374015,
Richard A. Handlon Correctional Facility
1728 Bluewater Highway
Ionia, MI 48846.

s/LaShawn Saulsberry
Deputy Clerk